J-A29023-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: B.W. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.N., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 434 WDA 2021 |

Appeal from the Order Entered March 17, 2021
In the Court of Common Pleas of Fayette County Orphans' Court at
No(s):  No. 6- ADOPT- 2019

BEFORE:   BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BOWES, J.:                    **FILED: FEBRUARY 8, 2022**

C.N. ("Mother") appeals from the order entered on March 17, 2021, which denied her petition to terminate the parental rights of A.W. ("Father") as to their daughter, B.W., born in February 2015, in order to allow Mother's husband, N.N. ("Stepfather") to adopt B.W.  We reverse and remand for proceedings consistent with this memorandum.

This appeal involves Mother's second petition to terminate Father's parental rights as to B.W.  A prior panel of this Court detailed much of the family history on Mother's appeal from the denial of her first petition.  We restate the relevant portions as follows:

> Mother and Father are the parents of [B.W].  Mother and Father never married.  Mother resides in Mills Run, Pennsylvania, with

_____

[*] Retired Senior Judge assigned to the Superior Court.

her three daughters, E.L.N. (born in July 2013), [B.W.] and C.R.N. (born in April 2018).[1] After [B.W.]'s birth in February 2015, [B.W.] resided with Mother, Father, and E.L.N., until April 2015, when Father disappeared for four months, until late August or the beginning of September 2015. Mother explained that, when Father left for work one day in August 2015, he left behind all of his belongings, and did not make any phone calls to her for four months. Between late August 2015 and January 2017, Father had only sporadic contact with [B.W]. Mother stated that Father would speak with [B.W.] either over the telephone or, infrequently, in person, but only when "he just felt like it." In December 2016, when Mother's house burned down, Mother was staying at her mother's home, and Father came to live there with Mother. Mother testified that she and Father would live together off and on for "just reasons." Mother testified that Father did not visit [B.W.] when he was not living with Mother.

On April 6, 2017, Mother and Father permanently ended their relationship. According to Mother, between April 2017 and June 2017, Mother and Father did not reside together, and Father saw [B.W.] only three times. . . . Father's last visit or in-person contact with [B.W.] was on June 11, 2017, when [B.W.] was two years old. Mother stated that, after June 11, 2017, Father would "go weeks" without contacting her. Since June 11, 2017, Father did not give [B.W.] any Christmas cards or gifts, nor did he call her. Father had not attended or taken [B.W.] to any of her physician's or dentist's appointments since that date, nor had he provided any meals for [B.W.], comforted [B.W.] when she was hurt, or tucked her into bed at night.

. . . Father filed a custody Complaint regarding [B.W.] in November 2018. . . .

Mother married Stepfather in October 2018. Mother had an active child support [o]rder against Father between 2015 and [April 9, 2020]. In June 2018, Mother and Stepfather received an

---

[1] As of the instant termination petition, Mother also resides with her son, D.D.N. (born in February 2020). Additionally, we observe that in the notes of testimony from the instant termination proceedings, the initials for Mother's eldest child are A.L.N., not E.L.N. However, as this child is not part of this appeal, we do not alter our prior abbreviation to match the current record.

insurance card for [B.W.], and they were aware that Father also provided health insurance for [B.W.].

Mother filed the [first] termination [p]etition on February 13, 2019. Therein, Mother alleged that [B.W.] had lived with her since birth; Father ha[d] not seen [B.W.] since June 11, 2017; Father had evidenced a settled purpose to relinquish his claim to [B.W.]; and Father ha[d] refused or failed to perform parental duties. On April 9, 2020, the [orphans'] court conducted a termination hearing.

*In re Adoption of B.M.W.*, 240 A.3d 125 (Pa.Super. 2020) (non-precedential decision at 1-4) (footnotes and citations omitted).

On December 23, 2019, the orphans' court denied Mother's petition, concluding that because Father had initiated custody litigation, Mother had failed to establish that Father took no action during the six months preceding the filing of the petition. Additionally, the court found that Mother had created obstacles to prevent Father from having contact with B.W. and concluded that Mother failed to establish that termination would be in B.W.'s best interest.

Mother appealed to this Court. Upon review, we concluded that the court's credibility and weight determinations were supported by the record and the court did not err or abuse its discretion in finding that Mother failed to sustain her burden of proof. Thus, on August 7, 2020, we affirmed the order of the orphans' court. *Id*.

During the pendency of that appeal, the parties began reunification proceedings for Father and B.W.[2] Father attended three sessions with B.W.

_____

[2] We noted in the prior appeal that the court in the custody case had appointed Kathryn Vozar as a reunification counselor. *In re Adoption of B.M.W.*, 240

in February 2020.  While the sessions went well, Father appeared to be under the influence of drugs at the second session.  Consequently, Ms. Vozar, the reunification counselor who coordinated the sessions, required Father to undergo a drug screen before the third session.  Although he had one week to comply, Father did not undergo a drug screen until the morning of the third session, February 27, 2020.  The results were not immediately available and Father was permitted to attend that third session.  Subsequently, the test yielded positive results for cocaine and heroin.  As a result, Ms. Vozar stopped any further reunification sessions until Father provided proof of treatment and two months of negative drug screens.  Father never provided the documentation to Ms. Vozar or contacted her about treatment and the reunification proceedings ceased.  N.T., 1/20/21, at 98-103, 107, 110.

Instead, in April 2020, Father reached out directly to Mother to video chat with B.W. via Facebook Messenger.  Father had three video chat sessions with B.W. in April 2020.  However, during the last session, Father upset B.W. and she terminated the call, crying hysterically.  *Id*. at 29-31; N.T., 2/18/21, at 13, 15.  Based on this interaction, Mother asked her counsel to send a letter

_____

A.3d 125 (Pa.Super. 2020) (non-precedential decision at 13 n.11).  Ms. Vozar testified in the underlying proceedings that at the time of the prior termination hearings, Father had completed his initial intake but reunification proceedings had not yet begun because it was unclear from the court order who was responsible for the reunification fees.  N.T., 1/20/21, at 89, 96.

to Father's counsel advising him to act appropriately around B.W. and to re-initiate professionally supervised visitation.[3]  N.T., 1/20/21, at 38-40.

Mother and Father attempted to set up subsequent video chats and voice calls, and Father sent a video apology to B.W., but B.W. refused to talk to Father.  Finally, on April 30, 2020, B.W. spoke to Father on a voice call, but she ultimately terminated that call early as well.  *Id*. at 37, 40; N.T., 2/18/21, at 16-17, 20.  Father did not contact Mother or B.W. after April 30, 2020.[4]  N.T., 1/20/21, at 40, 82; N.T., 2/18/21, at 32.

Mother filed the instant petition for termination of Father's parental rights on November 19, 2020.  Therein, Mother alleged that Father had evidenced a settled purpose to relinquish his claim to B.W. as his last contact with B.W. was on April 30, 2020.  On January 20 and February 18, 2021, the

---

[3] The letter was mailed on April 21, 2020, but Father testified that he did not receive it until May of 2020.

[4] The following exchange occurred on Facebook Messenger after B.W. terminated the call:

> Father:  Why does she think I'm mean
>
> Mother: Because of the phone call from before.  This has messed with her anxiety really bad
>
> Father:  I wasn't being mean or making fun of her I just wanna be able to talk with her I feel so bad
>
> Mother:  She doesn't want to talk.  [B.W.] has a lot of problems and this situation is taking a toll on her.

Mother's Exhibit 3 at unnumbered 11.

orphans' court conducted termination hearings. The court incorporated the transcript from the prior termination proceeding and renewed Michael Ford, Esquire, as legal interest counsel and guardian *ad litem* ("GAL") for B.W. from the prior termination proceeding.[5] At the time of the instant termination hearings, B.W. was just shy of six years old. Mother testified on her own behalf and presented the testimony of Ms. Vozar and Father's girlfriend. Father testified on his own behalf and presented the testimony of his sister. On March 17, 2021, the orphans' court denied Mother's petition.

This appeal followed. Both Mother and the orphans' court complied with Pa.R.A.P. 1925. Mother presents the following issues:

A. Whether the [orphans'] court erred by failing to properly analyze Father's failure to perform parental duties within the six months preceding Mother's termination of parental rights petition and failing to assess Father's failure to do the same when looking at the "whole record" pursuant to 23 Pa.C.S.A. §2511(a)(1) and applicable case law.

B. Whether the [orphans'] court abused its discretion by exhibiting bias in favor of Father by prejudging the case and granting leeway to him while appearing hostile against Mother throughout the proceeding and characterizing Mother's actions as "devious" in its opinion, which was unsupported by the record.

C. Whether the [orphans'] court erred by failing to consider [B.W.]'s best interest under 23 Pa. C.S.A. §2511(b).

D. Whether the [orphans'] court erred by failing to ensure the [GAL] met the standard mandated by 23 Pa.C.S.A. §2313(a), requiring appointment of a GAL to advocate for [B.W.]'s best

_____

[5] We note with disapproval that Attorney Ford did not file a brief in this appeal advocating B.W.'s legal interests.

- 6 -

interests and express Child's preferences, when the GAL: failed to meet [B.W.], assess bond, or make a recommendation to the court.

Mother's brief at 3-4 (unnecessary capitalization omitted).

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized [the appellate court's] deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (cleaned up). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by §2511 of the Adoption Act and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under [§]2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§]2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [§]2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (citation and quotation marks omitted).

Here, Mother petitioned to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b). These subsections provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
>> . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental,

- 8 -

physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b). Termination is proper when the moving party proves grounds for termination under any subsection of §2511(a), as well as §2511(b). *T.B.B.*, *supra* at 395. If the court finds that the moving party has satisfied the statutory grounds for termination, "it must then determine whether the termination of parental rights serves the best interests of the child." *In re C.T.*, 944 A.2d 779, 782 (Pa.Super. 2008) (citation omitted).

Our Supreme Court set forth the proper inquiry under §2511(a)(1) as follows:

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998) (citation omitted).

As it relates to timing, this Court further explained,

the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light

- 9 -

of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004) (citations omitted).

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 337 (Pa.Super. 2002). In this vein, "[a] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Id*. at 340 (citation omitted). As it relates to §2511(a)(1), "[a] parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent must use all available resources to preserve the parental relationship and must exercise 'reasonable firmness' in resisting obstacles placed in the path of maintaining the parent-child relationship." *In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super. 2003) (citation omitted). "This court has repeatedly recognized that parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her immediate physical and emotional needs." *Id*. (cleaned up).

Instantly, the relevant six-month period was from May 19 to November 19, 2020. As noted hereinabove, Father had no contact with B.W. during that period. In explaining its reasons for denying the termination petition, the orphans' court provided the following summary:

> The court finds that the April 21st, 2020 letter impeded free communication between the non-custodial parents and [B.W]. The court finds that the ambiguously hostile nature of the

language of the letter, combined with Father's relatively limited education, was at best inarticulate and at worst, insidious. Indeed, the tactic of threatening the Father for attempting to communicate with [B.W.], succeeding, and then arguing that the Father has not been proactive **enough** in his efforts to communicate smacks of deviousness. It constitute the very type of "deliberately created obstacle" contemplated by the Pennsylvania Superior Court in *In re B.,NM.*, 856 A.2d 847, 855-56 (Pa.Super. 2004).

Meanwhile, the Father continued to litigate the appeal of the denial of the February 13th, 2019 termination of parental rights petition before the Pennsylvania Superior Court and, on August 7th, 2020, prevailed.

The court finds that the father has neither evidenced a settled purpose of relinquishing a parental claim to [B.W.] nor has he refused or failed to perform parental duties.

Orphans' Court Opinion, 3/17/21, at 4 (capitalization altered; emphasis in original).

Mother contends that she established grounds for involuntary termination of Father's parental rights pursuant to §2511(a)(1) due to Father's lack of contact with B.W., which she avers was due to his own inaction, not Mother's letter. Mother's brief at 30. Mother further avers that Father admitted to doing nothing for B.W. during the relevant six-month period and "did nothing to overcome [the] perceived 'closed door'" ostensibly created by her letter. *Id*. at 32-33. Thus, Mother argues that "[f]or the second time, the [orphans' c]ourt failed to consider Father's lack of effort and instead focused exclusively on Mother's conduct." *Id*. at 33. Regarding the court's emphasis on Father litigating the prior appeal, Mother avers that Father's brief was filed on May 4, 2020, nothing else was filed by either party after that

- 11 -

date, and "[i]dly awaiting a pending Superior Court decision is not 'performing parental duties' within the six-month look-back period." *Id*. at 55.

Instantly, the filings related to the prior appeal are not part of the certified record and thus we cannot determine whether Father actively participated in the appellate process during the relevant six-month period. Even assuming Father actively participated in response to Mother's appeal of the order denying her petition to terminate Father's parental rights, what we find much more telling is Father's actions in maintaining contact with B.W. after facing various obstacles, *i.e.*, his negative drug test, B.W. not wanting to talk to him on informal calls after he upset her, and the letter from Mother's counsel advising Father's counsel to re-initiate professionally supervised visitation.

Upon review of the parties' briefs and certified record, we conclude that the court abused its discretion in finding that Mother failed to establish her evidentiary burden under §2511(a)(1). Stated simply, the record does not support the trial court's elevation of Mother's letter over Father's inaction. In fact, the letter, while critical of Father's interactions with B.W., can neither be described by this Court as "insidious," "threatening," or "hostile." The letter did not order Father to stop contacting B.W., but rather, given his conduct during the offending video chat, asked counsel to "advise your client that he must set up professionally supervised visitation and refrain from harassing my client and antagonizing this child. I do not know how much control you have over your client, but it is necessary to have third-party guidance in order to

prevent further harm." Mother's Exhibit 4 (Letter from Allison Reynolds, Esquire, 4/21/20) at unnumbered 2. Father took no actions to attempt to overcome this purported obstacle, nor did he take any actions to re-initiate professionally supervised visitation.

Indeed, Father's initial inaction regarding the professionally supervised reunification proceedings prompted the informal video chats. As noted hereinabove, the reunification proceedings, with which Mother complied, were suspended due to Father's positive drug test for cocaine and heroin and his failure to follow through with recommended drug treatment and evidence of sobriety. According to Ms. Vozar, she did not believe it was safe for Father to be around B.W. while under the influence of cocaine and heroin and she was not willing to resume reunification proceedings until Father could demonstrate sobriety. Father never contacted Ms. Vozar about treatment, his sobriety, or about resuming sessions. Instead, he sought informal video chat sessions with B.W. in April 2020. Although Mother permitted these, they ultimately led to the conversation that upset B.W. so much that Mother asked Father to re-initiate professional visitation sessions. Notably, at the time of the termination hearings, Father testified that he still was not sober.

Critically, the certified record does not indicate that reunification is possible at this point or that Father exerted a "sincere and genuine effort to maintain a parent-child relationship[.]" *In re C.M.S.*, *supra* at 462. Reunification proceedings were halted because of Father's drug use and, despite being offered treatment, Father continued to be an active drug user

as of the time of the termination hearings. He failed to have any contact with B.W. during the relevant six-month period and neglected to make any effort to overcome the perceived obstacle of Mother's letter, which contrary to the orphans' court's interpretation, did not bar contact with B.W., but requested that Father comply with the terms of professionally supervised visitation. Father had an avenue to maintain contact with his daughter, but he declined to overcome the obstacle of his drug addiction in order to restart the supervised vistation, thereby rendering reunification impossible. Based on the foregoing, Mother established her burden under §2511(a)(1), and the orphans' court abused its discretion in finding otherwise.

Instantly, because the orphans' court denied Mother's petition based on an erroneous conclusion that she failed to establish grounds under §2511(a)(1), the court did not conduct the requisite §2511(b) analysis. Relatedly, Mother argues that Attorney Ford did not advocate for B.W.'s best interests or express her preference. Mother's brief at 73. Thus, Mother contends that "[B.W.] had no voice in this action" and requests "remand for consideration of bond" and, if necessary, "to appoint counsel for [B.W]." *Id*. at 77. The orphans' court found that the record was "full and complete with respect to this issue" and that this Court's decision in the prior appeal contained "a true and correct reiteration thereof." Orphans' Court Statement in Lieu of Opinion, 4/9/21, at 5. Mother counters that because this Court found Mother had not met her burden under §2511(a) on the prior appeal, we did not consider Mother's arguments about Attorney Ford's representation of

- 14 -

B.W. Mother's brief at 75. Moreover, Mother argues that Attorney Ford did not meet with B.W. prior to the instant termination hearings, despite B.W. having aged two years since the prior hearings, and did not ask Father a single question. *Id*. at 76-77.

Our Supreme Court has held "that Subsection 2313(a)[6] simply does not require counsel to place the child's legal interests on the record. Indeed, the statutory directive is to the court, not counsel." *In re Adoption of K.M.G.*, 240 A.3d 1218, 1227 (Pa. 2020). The Court continued, stating:

> We additionally reject the underlying assumption that the absence of a child's preference on the record equates to counsel's failure to ascertain the child's preferred outcome or to provide effective representation of his or her client for purposes of Section 2313(a). Children for whatever reason may understandably resist stating whether their parents' rights should be terminated and may be averse to declaring their preference between their natural and foster parents. While we recognize that it may be a best practice for a child's legal counsel to divulge the child's preferences in order to advocate for their client's preferred outcome, we find nothing in the language of the Adoption Act requiring that their preference be placed on the record, which instead only requires that the child be appointed counsel. Moreover, we observe that the child's legal counsel has

---

[6] This subsection provides as follows:

> **(a) Child.--**The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

23 Pa.C.S. § 2313(a).

a duty of confidentiality to their client, the child, such that they should not be compelled to disclose the child's preferences. We are thus wary to create a bright-line rule requiring counsel and the courts to place the children's preferred outcome on the record as we are concerned by both the potential violation of a child's attorney-client privilege and with the real specter of placing unconscionable stress on a child by mandating that her feelings regarding her parents and caretakers be made public and permanently enshrined in the record.

*Id*. at 1237-38.

On appeal from the denial of Mother's first termination petition, this Court recounted that Attorney Ford had stated at that underlying termination hearing that he had met with B.W., who was then four years old. *B.M.W.*, *supra* (non-precedential decision at 5-6). Attorney Ford offered no such indication at the instant termination proceedings, despite B.W. having aged approximately two years in the interim and the circumstances having changed. Attorney Ford also did not state her preference at the instant termination hearings. Rather, he merely left it up to the discretion of the orphans' court. *See* N.T., 2/18/21, at 92-92. While counsel is not required to place a child's preference on the record, we are troubled by the combination of Mother's assertion that Attorney Ford failed to meet with B.W. prior to the termination hearings and Attorney Ford's lack of advocacy on B.W.'s behalf at the termination and appellate level.

Before we address the adequacy of that representation, however, we observe that "where the orphans' court has appointed a single attorney to serve as [GAL] and legal counsel to represent both the child's best interests and legal interests, [our Supreme Court] concluded an appellate court should

review *sua sponte* whether the court made a determination that those interests did not conflict." ***In re P.G.F***, 247 A.3d 955, 964–65 (Pa. 2021). The Court "cautioned that 'appellate review of this question does not involve second-guessing whether GAL/Counsel in fact had a conflict but solely whether the orphans' court made the determination in the first instance.'" ***Id***. at 965 (quoting ***K.M.G.***, ***supra*** at 1235-36) (cleaned up)).

Presently, there is no indication in the certified record that the orphans' court made the requisite determination that then-almost-six-year-old B.W.'s legal and best interests did not conflict. Although this Court noted during the prior appeal that there appeared to be no conflict, nearly two years passed between the first termination proceedings and the instant proceedings. Moreover, it is entirely possible that B.W.'s legal and best interests may have come into conflict at the time of the instant proceedings regardless of any apparent non-conflict at the prior proceedings. Since we cannot determine from the certified record whether the orphans' court fulfilled its §2313(a) duty to "determine whether counsel can represent the dual interests before appointing an individual to serve as GAL/Counsel for a child[,]" we cannot fulfill our duty to *sua sponte* "verify that the orphans' court indicated that the attorney could represent the child's best interests and legal interests without conflict." ***K.M.G.***, ***supra*** at 1236.

Based on the foregoing, we reverse the order denying Mother's petition to terminate Father's parental rights and remand the case for the parties to present evidence at a §2511(b) hearing regarding B.W.'s preferred outcome

in this termination matter and the effect that termination would have on B.W.'s developmental, physical, and emotional needs and welfare. We also direct the orphans' court to fulfill its §2313(a) duty as articulated in **P.G.F.**, **supra**, and determine whether Attorney Ford may represent the dual interests of B.W. If the court determines that no conflict exists, Attorney Ford may represent B.W. at the §2511(b) hearing. If the court determines there is a conflict between B.W.'s legal and best interests, the court shall appoint separate legal counsel prior to the §2511(b) hearing. Likewise, we direct Attorney Ford or newly-appointed counsel to meet with B.W. prior to the hearing to determine her preference and to advocate on her behalf.[7]

Order reversed. Case remanded for proceedings consistent with this memorandum. Jurisdiction relinquished.

---

[7] We observe that Mother requests this Court remand the matter before another jurist based on the orphans' court's bias in favor of Father and hostility towards Mother. Mother's brief at 57. "Generally, a party must seek to have a judge recused from a case, by first bringing the petition for recusal before that jurist, thus enabling the judge to evaluate the reasons for recusal firsthand." **In re Adoption of L.J.B.**, 18 A.3d 1098, 1112 (Pa. 2011) (citation omitted). Our Supreme Court has held that *sua sponte* removal of a lower court judge "exceed[s] the authority of the Superior Court. The parties are required to file a motion to recuse and for the judge in question to rule; his or her decision must stand absent an abuse of discretion." **Commonwealth v. Whitmore**, 912 A.2d 827, 834 (Pa. 2006). Instantly, Mother raised her recusal request for the first time on appeal. Accordingly, there was no motion for the orphans' court to rule on, and no discretion for us to review. As we cannot *sua sponte* address this claim, and it cannot be raised for the first time on appeal, we do not reach this issue. Should Mother wish to pursue this issue, she may file a petition for recusal with the orphans' court upon remand.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  2/8/2022